# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

STEPHANIE ALLORI HILLIS, on behalf of herself and allothers similarly situated,

Plaintiff,

v.

ANNE ARUNDEL DERMATOLOGY, P.A.,

Defendant.

Civil Action No. 6:25-cv-1936

**COMPLAINT – CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Stephanie Allori Hillis ("Plaintiff") brings this class action against Defendant Anne Arundel Dermatology, P.A. ("AAD" or "Defendant") in her individual capacity and on behalf of all others similarly situated (the "Class Members"), and alleges, upon personal knowledge as to her own actions, her counsel's investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this class action lawsuit to address Defendant's outrageous, illegal, and widespread practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to Meta Platforms, Inc. ("Meta" or "Facebook").

2.     As recently as 2025, Anne Arundel Dermatology regularly disclosed information about prospective and actual patients, including their actual or potential dermatologists, the clinics they visited or may visit, and their personal identities, to Meta without those patients' knowledge, authorization, or consent.

3.     Defendant's unauthorized disclosures of Private Information occurred, and continues to occur, because of the tracking technology Defendant installed on its Website, aadermatology.com (herein "Website," which includes all pages on the aadermatology.com domain), specifically, the Meta Pixel.

4.     The Meta Pixel allows unauthorized third parties to intercept patients' communications, capture and view their Private Information, analyze it for purposes entirely unrelated to the delivery of healthcare, and ultimately exploit it to serve targeted advertising to individuals.

5.     Defendant owns and controls its Website, which it encourages patients and prospective patients to use for: (1) scheduling appointments; (2) learning about dermatological services and treatment options; (3) identifying providers; (4) submitting contact requests and forms; and (5) accessing information about locations and insurance.

6.     By coding the Meta Pixel onto its Website, Defendant knew that Private Information of patients would be transmitted in connection with seeking and receiving medical services.

7.     Plaintiff and other Class Members reasonably believed that when they visited and used Defendant's Website, they were communicating solely with their trusted healthcare provider. Nothing about the site's appearance suggested that third parties, such as Meta, were secretly intercepting and obtaining the information they submitted.

8.     In reality, the Meta Pixel embedded on Defendant's Website surreptitiously tracked, logged, and transmitted patients' online interactions and communications (including Private Information) to Meta without first obtaining proper authorization, in violation of the Health Insurance Portability and Accountability Act (HIPAA), state law, industry standards, and patient

2

expectations.

9.     By installing and using the Meta Pixel on its Website, Defendant effectively placed a surveillance device on patients' browsers and devices, enabling their interactions and communications to be intercepted, recorded, and analyzed in real time as they communicated with their provider's online platform.[1]

10.     For example, when patients clicked the "Schedule an Appointment" button, the Meta Pixel captured that event and transmitted it, along with identifiers such as IP address and Facebook ID to Meta. Operating exactly as Meta designed it and as Defendant intended, the Meta Pixel caused Plaintiff's and Class Members' Private Information to be unlawfully intercepted and disclosed to a third party.

11.     The Office for Civil Rights at HHS has issued a Bulletin highlighting the obligations of HIPAA-covered entities under the HIPAA Privacy, Security, and Breach Notification Rules when using online tracking technologies.[2] The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules." In other words, HHS has expressly stated that Defendant's implementation of the Meta Pixel violates HIPAA Rules.

12.     The information Defendant divulged to Meta allowed Meta to learn that specific individuals were patients seeking and receiving dermatological treatment at AAD's clinics. In and of itself, this reveals the fact that an individual is being treated for dermatological conditions and

---

[1] *See Retargeting*, FACEBOOK (last visited Aug. 26, 2025), https://www.facebook.com/business/goals/retargeting, (explaining how the pixel tracks and transmits Website users' interactions and communications, allowing for individualized retargeting and marketing).

[2] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEP'T OF HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html (rev. June 26, 2024).

has received or will receive dermatology services. In turn, upon information and belief, this information was used and/or sold for further exploitation and targeted advertising.

13. Patients do not anticipate that their trusted healthcare provider will share their private information with social media companies for commercial purposes and future exploitation.

14. Neither Plaintiff nor any other Class Member signed a written authorization allowing Defendant to send their Private Information to Meta.

15. Similarly, upon information and belief, Defendant does not have a HIPAA-compliant Business Associate Agreement in place with Meta.

16. In response to the use of tracking technologies by HIPAA-covered entities, the HHS Bulletin warns that:

> "An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI."

The Bulletin further notes that disclosures can reveal "incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment."[3]

17. As one federal court has observed in litigation involving the use of the Meta Pixel by healthcare organizations,

> "[o]ur nation recognizes the importance of privacy in general and health information in particular: the safekeeping of this sensitive information is enshrined under state and federal law. The allegations against Meta are troubling: Plaintiffs raise potentially strong claims on the merits, and their alleged injury would be irreparable if proven."[4]

---

[3] *Id.*

[4] *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 783 (N.D. Cal. 2022).

4

18.    Consequently, Plaintiff brings this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein, to enjoin Defendant from making similar disclosures of its patients' Private Information in the future, and to require Defendant to fully disclose the specific Private Information it transmitted to Meta and identify all recipients of that information.

19.    As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including invasion of privacy, loss of the benefit of their bargain, diminution of value of their Private Information, statutory damages, and the continued and ongoing risk to their Private Information.

20.    On behalf of herself and all similarly situated persons, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of personal information; awarding statutory damages, attorney's fees, and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES

21.    Plaintiff is a natural person and citizen of Maryland.

22.    Defendant is a Maryland corporation, with its principal place of business located at 1306 Concourse Drive, Suite 201, Linthicum Heights, Maryland, 21090. Defendant runs medical clinics in the states of North Carolina, Maryland, Florida, Georgia, Virginia, and Pennsylvania.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen

of a state different from Defendant.

24. Additionally, this Court has federal question jurisdiction under 29 U.S.C. § 1331 because this Complaint alleges a question of federal laws under the Electronic Communications Privacy Act of 1986 (28 U.S.C. § 2511, *et seq.*, and 28 U.S.C. § 2702).

25. This Court has personal jurisdiction over Defendant because (1) Defendant has purposely directed its activities toward citizens of the State of Florida and purposely availed itself of the privilege of conducting activities within the State of Florida, thereby invoking the benefits and protections of Florida law; (2) Plaintiff's and the Class Members' claims both arise out of and relate to Defendant's Florida-related activities; and (3) the exercise of this Court's jurisdiction comports with fair play and substantial justice. Although incorporated and headquartered in Maryland, Defendant owns and operates multiple dermatology clinics in Florida, including within this District, and its conduct at issue, embedding the Meta Pixel on its Website to capture the communications of patients seeking care in Florida (and other states), gives rise to the claims asserted here.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because Defendant transacts business in this District, is subject to this Court's personal jurisdiction with respect to this action, and because a substantial portion of the events and omissions giving rise to the claims occurred in this District. Specifically, Defendant's use of the Meta Pixel to unlawfully intercept and disclose Private Information occurred in connection with patients domiciled in the Middle District of Florida.

**FACTUAL ALLEGATIONS**

**A. Defendant Disclosed Plaintiff's and Class Members' PII and PHI.**

27. Defendant is a dermatology practice group with more than sixty locations across

6

the Mid-Atlantic and Southeastern United States. In providing clinical and scheduling services, Defendant collects and maintains highly sensitive PII/PHI of its patients.

28.     In collecting and storing patients' PII/PHI, Defendant represented that it would safeguard that data in accordance with applicable state and federal law. Patients, including and the Class, likewise took reasonable steps to protect their PII/PHI.

29.     Defendant understood the importance of protecting patients' PII/PHI and, in its Notice of Privacy Practices, promised to safeguard such information and limit disclosures consistent with HIPAA and other requirements.

30.     Despite acknowledging these duties, on information and belief, Defendant failed to implement reasonable policies, training, and technical safeguards to prevent impermissible disclosures of patients' PII/PHI, including disclosures caused by its configuration of tracking technologies on its Website.

31.     Defendant promoted its Website as a primary access point for patients to find providers, request appointments, obtain information about upcoming treatments and procedures, submit referral and intake forms, and use other patient-facing features.

32.     To monitor and optimize those interactions, Defendant installed the Meta Pixel on its Website.

33.     A tracking pixel is a short snippet of code that measures user activity and causes certain data about a user's interactions to be transmitted to the tracking vendor.

34.     By using Defendant's Website, Plaintiff and Class Members unknowingly transmitted their PII and PHI to Meta via the Meta Pixel embedded on the site.

35.     In particular, when patients selected providers, clicked "Schedule Appointment," or submitted information through onsite forms, they communicated sensitive details they had no

reason to expect would be intercepted and shared with Meta.

36.     Defendant did not disclose to Plaintiff or the Class Members that their Website interactions and the health-related information conveyed there would be redirected to Meta for marketing and analytics purposes.

37.     The Meta Pixel deployed on Defendant's Website captured patient interactions in real time during the relevant period, including page views, button clicks, and form activity associated with care-seeking.

38.     Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their PII or PHI to Meta.

39.     Patients are entitled by law to the confidentiality of their protected health information and to the privacy of their communications with healthcare providers. Defendant violated these rights by: (1) implementing a system that covertly tracked and transmitted confidential patient interactions; (2) sending PHI/PII to Meta, a third party not authorized to receive it; and (3) doing so without notifying patients or obtaining their express written authorization.

### B.  The Meta Pixel.

40.     Meta is an advertising company that sells space on the social media platforms it operates. Meta's advertising is based on sophisticated user-categorizing and targeting capabilities powered by personal data from users of its platforms and other internet users.[5] Meta's targeting is exceptional because Meta surveils users' online activities both on and off its websites and apps.[6] This extensive tracking allows Meta to make highly personalized inferences about users, such as

---

[5] Business Help Center, *Why Advertise on Facebook, Instagram and Other Meta Technologies*, META, https://www.facebook.com/business/help/205029060038706 (last visited Sept. 15, 2025).
[6] Business Help Center, *About Meta Pixel*, META, https://www.facebook.com/business/help/742 478679120153?id=1205376682832142 (last visited Sept. 15, 2025).

their "interests," "behavior," and "demographics."[7] Meta gathers this information, makes these inferences, and uses them to identify targeted "audiences" likely to respond to specific advertisements. Access to such audiences is extremely valuable to Meta's advertising clients. In 2022, Meta generated approximately $113.64 billion, nearly 98% of its revenue, through advertising.

41.    The Meta Pixel, originally known as the Facebook Pixel, was first introduced in 2015.[8] It now serves as one of the main tools through which Meta collects personal data to build targeted audiences for its advertising business, although Meta's public descriptions of the Meta Pixel tend to hide and minimize this fundamental purpose of the tracking code. Instead, Meta describes the Meta Pixel as a simple "snippet of JavaScript code" that helps Website owners keep track of user activity on their websites.[9] Meta emphasizes that website managers can set up the Meta Pixel easily, without needing their web developer's assistance. "You only need to place a single pixel across your entire website."[10] The Pixel is installed on approximately 30 percent of popular internet websites. [11]

42.    The Meta Pixel transmits large amounts of data about each visit to every website where it is embedded. No matter what purpose (if any) a website owner has for allowing the Meta Pixel to run on their pages, the code is designed to gather a significant amount of information by

---

[7] Meta for Business, *Ad Targeting: Help your ads find the people who will love your business*, META, https://www.facebook.com/business/ads/ad-targeting (last visited Sept. 15, 2025).

[8] Cecile Ho, *Announcing Facebook Pixel*, META, https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/ (last visited Sept. 15, 2025).

[9] Meta for Developers, *Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel (last visited Sept. 15, 2025); Meta for Business, *Retargeting: Inspire People to Rediscover What They Love About Your Business*, META, (last visited Sept. 15, 2025) (explaining that the Meta Pixel records Website visitors and the actions they take in real time).

[10] Ho, *supra* note 8.

[11] Maria Puertas & Simon Fondrie-Teitler, *In 2023, Resolve to Fix Your Organization's Meta Pixel Problem*, THE MARKUP (Jan. 31, 2023), https://themarkup.org/levelup/2023/01/31/in-2023-resolve-to-fix-your-organizations-meta-pixel-problem.

default, with additional options permitting a website operator to collect even more data.

43.   In 2018, Meta introduced a "first-party cookie option" for the Meta Pixel to bypass improvements in how web browsers block third-party cookies, which have traditionally been the main way Facebook tracks people across the web.[12] Being embedded in websites as a first-party cookie, rather than as a third-party cookie, causes users' browsers to treat the Meta Pixel as if it is offered by the website they are visiting, instead of by Meta, a third party. When the Meta Pixel is embedded in a website as a first-party cookie, the third-party cookie-blocking features of modern web browsers do not prevent the Meta Pixel's collection of data.

44.   In short, by bypassing privacy measures designed to protect users' information, the Meta Pixel consistently captures HTTP headers, Pixel-specific data, and Button Click data on every visit to every website through its default operation. Meta acknowledges that the Meta Pixel is configured to collect this information and can gather the following non-exhaustive categories of data from the webpages where it is embedded:

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer, and the person using the Website.

**Pixel-specific Data** – Includes Meta Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels of those buttons, and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type, and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values

---

[12] Sergiu Gatlan, *Facebook to Circumvent Cross-Site Tracking Block with New First-Party Cookie*, SOFTPEDIA NEWS (Oct. 6, 2018), https://news.softpedia.com/news/facebook-to-circumvent-cross-site-tracking-block-with-new-first-party-cookie-523089.sht

10

unless you include them as part of Advanced Matching or optional values.[13]

45.    While some features of the Meta Pixel are standard, Defendant uses the tool in a narrower configuration. On AAD's Website, the Meta Pixel is triggered specifically when a patient initiates an appointment request, such as by clicking the "Schedule Appointment" button. This applies whether the patient accesses the site from a desktop or a mobile browser.



---

[13] Meta Pixel, *supra* note 9; *see also* Meta for Developers, *Meta Pixel: Advanced*, Meta, https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited Sept. 16, 2025); Business Help Center, *Best Practices for Meta Pixel Setup*, Meta, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last visited Sept. 16, 2025); Meta for Developers, *App Events API*, Meta, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Sept. 16, 2025); Meta for Developers, *Meta Pixel: Get Started*, Meta, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Sept. 16, 2025).



*Network traffic showing Meta Pixel firing when a user clicks "Schedule Appointment" on AAD's desktop Website.*

46.     Among other things, this configuration enables Meta to identify that a specific visitor attempted to book an appointment with Defendant. Meta itself explains that the Meta Pixel "tracks the people [who visit your Website] and the type of actions they take," which includes button clicks tied to scheduling.



*Network log confirming Meta Pixel transmission when the "Schedule Appointment" button is clicked from a mobile browser.*

47.     When a patient clicks to schedule an appointment, Meta's embedded code causes the patient's browser—desktop or mobile—to transmit a duplicate communication to Meta's servers at the same time it communicates with AAD. This hidden transmission includes details of

the appointment interaction, such as the fact of the click and associated identifiers, which are passed to Meta in real time and without patient authorization. The screenshot below showcases an example request captured in mobile browser traffic, showing metadata sent to Meta alongside the scheduling event.



48.     Meta links the information it gathers through the Meta Pixel with other user data by using personal identifiers sent along with the information the Meta Pixel is set to collect. For Facebook account users, these identifiers include the "c_user" IDs, which allow Meta to associate data with a specific Facebook account (and person), and "xs" cookies related to a browsing session. For both Facebook account users and those without accounts, these identifiers also include cookies that Meta connects to their browser, such as "dtr" and "fr" cookies.[14]

---

[14] Meta, *Cookies Policy* (Dec. 12, 2023), https://www.facebook.com/policy/cookies (last visited Sept. 21, 2025).

49.     The "c_user" ID labeled in Meta's software script reveals a Facebook account holder's Facebook ID ("FID"). A subscriber's FID is a unique sequence of numbers linked to that individual's Facebook profile. Entering "facebook.com/[FID]" into a web browser displays that person's Facebook profile. A FID thus identifies a person more precisely than a name.

50.     Meta informs Website managers that, among other things, the Meta Pixel allows "you… to track Facebook ad-driven visitor activity on your website…[and] use the data to analyze your website's conversion flows and optimize your ad campaigns."[15]

51.     Meta processes the large amounts of information collected from the Meta Pixel through its advertising systems, using it to identify users and their personal traits, categorize them for Meta's business needs, and target them with marketing messages from its advertising clients.

52.     Meta recognizes the use of data collected through the Meta Pixel tracking code. For instance, Meta refers to the Meta Pixel as one of its "Business Tools," and to websites with the Meta Pixel embedded as "Partners." Meta states in its Privacy Policy, among other places, that it uses "[i]nformation from Partners," explicitly including data about "[w]ebsites you visit and cookie data," to offer a personalized experience to users, including ads."[16]

53.     One way Meta uses data collected through the Meta Pixel for advertising is by creating "audiences" customized for specific advertisers. Meta determines these audiences using data from the Meta social media platform and/or information provided by the advertiser, such as email subscriber lists and activity tracked on their website(s), including through the Meta Pixel.

---

[15]  Meta, *Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Sept. 22, 2025).
[16]  Meta Privacy Center, *Privacy Policy* https://www.facebook.com/privacy/policy (last visited Sept. 22, 2025).

### C. Defendant's Privacy Policies.

54.    As outlined on the "Website Policy" page, https://aadermatology.com/privacy-policy/, Defendant publishes various privacy policies on its Website that represents to patients and visitors that it collects limited personal information only when users "submit an inquiry form, request an appointment, or request password assistance." The "Website Policy" page also explains that such information may include "name, email address, date of birth, [and] telephone number."

55.    The "Website Policy" page further assures patients and visitors the Defendant "will not sell or distribute your personal information to third parties unless we have your permission or are required to do so by law." The following is a screenshot from the Website Policy Page:

What We Collect                                                                    X

Information is collected when you complete an inquiry form, request an appointment, or request password assistance. Any information you provide such as name, email address, date of birth, or telephone number to Anne Arundel Dermatology, is kept confidential and secure and used only for the purposes for which you provided. We will not sell or distribute your personal information to third parties unless we have your permission or are required to do so by law.

56.    On the "Notice of Privacy Practices" page, https://aadermatology.com/hipaa-privacy-notice/, Defendant also publishes a HIPAA privacy notice that explicitly acknowledges its legal obligations under HIPAA, as shown below:

**2. WE HAVE A LEGAL DUTY TO SAFEGUARD YOUR PROTECTED HEALTH INFORMATION (PHI)**

Anne Arundel Dermatology, its covered entity practice sites, and other affiliated entities are legally required to protect the privacy of your health information.  We call this information "protected health information" or "PHI" for short. PHI is information that can be used to identify you, which has been created or received about your past, present, or future health or condition, the provision of healthcare to you, or the payment for this health care. We are required to provide you with this notice about our privacy practices that explains how, when, and why we use and disclose your PHI. We are required to notify you in the event of a breach of your unsecured PHI. With some exceptions, we may not use or disclose any more of your PHI than is necessary to accomplish the purpose of the use or disclosure. We are legally required to follow the privacy practices that are described in this notice. However, we reserve the right to change the terms of this notice and our privacy policies at any time. Any changes will apply to the PHI we already have. Before we make an important change to our policies, we will promptly change this notice and post a new notice in a location clearly visible and accessible to all individuals who receive treatment or services at any Anne Arundel Dermatology facility. You can also request a copy of this notice from the Anne Arundel Dermatology Privacy Office listed in Section 5 at any time and can view a copy of the notice on our website at www.aadermatology.com.

57.     The HIPAA privacy notice goes on to list the specific circumstances where Defendant may use or disclose PHI without prior written authorization, including:

**3.2. Certain Other Uses and Disclosures That Do Not Require Your Consent**

**3.2.1. When disclosure is required by federal, state, or local law, judicial or administrative proceedings, or law enforcement.** For example, we make disclosures when a law requires that we report information to government agencies and law enforcement personnel about victims of abuse, neglect, or domestic violence; when dealing with gunshot and other wounds, or when ordered in a judicial or administrative proceeding.

**3.2.2. For public health activities.** For example, we report information about births, deaths, and various diseases to government officials in charge of collecting that information, and we provide coroners, medical examiners, and funeral directors necessary information relating to an individual's death.

**3.2.3. For health oversight activities**. For example, we will provide information to assist the government when it conducts an investigation or inspection of a health care provider or organization.

**3.2.4. For purposes of organ donation.** We may notify organ procurement organizations to assist them in organ, eye, or tissue donation or transplants.

**3.2.5. For research purposes**. In certain circumstances, we may provide PHI in order to conduct research.

**3.2.6. To avoid harm.** In order to avoid a serious threat to the health or safety of a person or the public, we may provide PHI to law enforcement personnel or persons able to prevent or lessen such harm.

**3.2.7. For specific government functions.** We may disclose PHI of military personnel and veterans in certain situations. We may also disclose PHI for national security purposes, such as protecting the President of the United States or conducting intelligence operations.

**3.2.8. For workers' compensation purposes.** We may provide PHI in order to comply with corkers' compensation laws.

**3.2.9. Appointment reminders and health-related benefits or services.** We may use PHI to provide appointment reminders or give you information about treatment alternatives, or other health care services or benefits we offer.

**3.2.10. Fundraising activities**. We may use PHI to raise funds for our organization. The money raised through these activities is used to expand and support the health care services and educational programs we provide to the community. If you do not wish to be contacted as part of our fundraising efforts, you can opt-out by notifying the Anne Arundel Dermatology Privacy Officer listed in Section 5.

**3.2.11. Marketing.** We must obtain your written authorization before we can use or disclose your PHI for marketing purposes, except for face-to-face communications made by us to you or a promotional gift of nominal value provided by us to you. We must also obtain your written authorization before we sell your PHI.

58.     At § 3.4, the HIPAA privacy notice also states unequivocally that "[i]n any situation

17

other than those described above, we will ask for your written authorization before we use or disclose your PHI." Further, at § 3.2.11, it warns patients that "we cannot sell your personal health information or use it for marketing purposes without your written authorization."

59.     Defendant violated each of these assurances by embedding the Meta Pixel on its Website, which caused Plaintiff and Class Members' communications and Private Information to be transmitted to Meta whenever they clicked the "Schedule Appointment" button or otherwise interacted with the Website.

60.     Defendant's privacy policy(ies) on its Website nowhere disclosed that patients' PHI/PII would be transmitted to Meta or any other social-media platform. To the contrary, Defendant's policies led patients to reasonably believe that such disclosures would never occur absent a specific written authorization.

61.     By secretly transmitting PHI and PII to Meta without authorization, Defendant breached the explicit promises in its own policies and deprived Plaintiff and Class Members of the confidentiality protections to which they were entitled.

**D.  Plaintiff Stephanie Allori Hillis's Experiences.**

62.     Plaintiff Stephanie Allori Hillis entrusted her PII and PHI to Defendant as a condition of receiving dermatological services.

63.     Plaintiff accessed Defendant's Website to obtain care and at Defendant's direction. Plaintiff reasonably expected that her communications with Defendant via the Website—including when she searched for providers, requested appointments, and submitted intake information—were confidential, solely between herself and her healthcare provider, and would not be transmitted to or intercepted by a third party.

64.     Plaintiff provided her Private Information to Defendant in good faith and trusted

that the information would be safeguarded consistent with Defendant's policies, HIPAA, and state law.

65.    As described herein, Defendant facilitated Meta's interception of Plaintiff's communications, including those containing personally identifiable information, protected health information, and related confidential information. Defendant enabled these interceptions through its use of the Meta Pixel without Plaintiff's knowledge, consent, or express written authorization.

66.    On information and belief, Defendant transmitted to Meta Plaintiff's email address, phone number, computer IP address, device identifiers, and other contact information submitted through Defendant's Website, as well as details such as appointment type and date, provider selected, page navigation, button/menu selections, and content typed into free-text fields.

67.    By failing to obtain the requisite authorization, Defendant breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected health information.

68.    Defendant never informed Plaintiff that her PII and PHI were shared with Meta.

69.    Plaintiff suffered actual injury, including diminution in the value of her Private Information, a form of intangible property entrusted to Defendant and compromised as a result of Defendant's intentional acts. Plaintiff also suffered lost time, annoyance, interference, and inconvenience, together with anxiety and heightened concerns regarding the loss of her privacy.

70.    Plaintiff has a continuing interest in ensuring that her PII and PHI—much of which, on information and belief, remain in Defendant's possession and systems—are adequately protected and safeguarded from future unauthorized disclosure.

**CLASS ACTION ALLEGATIONS**

71.    Plaintiff brings this action on behalf of herself and on behalf of all other persons

similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

72.     The Nationwide Class (referred to as the "Nationwide Class" or the "National Class") that Plaintiff seeks to represent is defined as follows:

**The Nationwide Class**

> **All individuals residing in the United States whose PHI and PII were disclosed by Defendant via the Meta Pixel to a third party without proper authorization or consent.**

73.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

74.     Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

75.     Numerosity, Fed R. Civ. P. 23(a)(1). The National Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are tens of thousands of individuals (or more) whose PII and PHI may have been improperly disclosed to Meta, and the Class is identifiable within Defendant's records.

76.     Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a.     Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b.     Whether Defendant had duties not to disclose the Private Information of

Plaintiff and Class Members to unauthorized third parties;

c.      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

d.      Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been transferred;

e.      Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f.      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

g.      Whether Defendant violated the consumer protection statutes asserted as claims in this Complaint;

h.      Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

77.     Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Meta Pixel, due to Defendant's misfeasance.

78.     Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the

damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

79.     Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

80.     Policies Generally Applicable to the Class. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

81.     The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure

to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

82.    The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

83.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

84.    Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

85.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

86.    Issue Certification, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are

appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a.    Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

b.    Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the Private Information belonging to Plaintiff and Class Members;

d.    Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be and was disclosed to third parties;

e.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f.    Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

87.    Plaintiff reserves the right to amend or modify any Class definition as this case progresses.

**COUNT I**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1) *et seq*.**
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiff and the Nationwide Class)**

88.    Plaintiff repeats and re-alleges paragraphs 1 – 87 as if fully set forth herein.

24

89. The ECPA protects both sending and receipt of communications.

90. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

91. The transmissions of Plaintiff's Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

92. The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

93. **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

94. **Content**. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

95. **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

96. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic

communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiff's and Class Members' browsers;

    b.  Plaintiff's and Class Members' computing devices;

    c.  Defendant's web-servers; and

    d.  The Meta Pixel deployed by Defendant (and created by Meta) to effectuate the sending and acquisition of patient communications.

97. By utilizing and embedding the Meta Pixel (a device) on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the contents of electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

98. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Meta Pixel, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to Meta.

99. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medical specialty, and scheduling through Defendant's Website and other Websites Plaintiff and Class Members were directed to for scheduling.

100. By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

101. By intentionally using, or endeavoring to use, the contents of the electronic

communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

102. **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

103. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Meta Pixel tool to track and utilize Plaintiff's and Class Members' Private Information for financial gain.

104. Defendant was not acting under color of law to intercept Plaintiff and the Class Members' wire or electronic communication.

105. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Meta Pixel tracking code.

106. Any purported consent, if any, that Defendant received from Plaintiff and Class Members was not valid.

107. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious and designed to violate federal and state legal provisions, including as described above the following: (1) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; and (2) violation of the ECPA 18 U.S.C. § 2511(1) *et seq*.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Nationwide Class)

27

108. Plaintiff repeats and re-alleges paragraphs 1 – 87 as if fully set forth herein.

109. As a condition of utilizing Defendant's digital platforms and receiving services from Defendant, Plaintiff and the Class provided their Private Information and compensation for their medical care.

110. When Plaintiff and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

111. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

112. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information without consent to third parties like Meta.

113. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

114. Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT III**
**VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE**
**18 U.S.C. § 2511(3)(a)**
**(On Behalf of Plaintiff and the Nationwide Class)**

115. Plaintiff repeats and re-alleges paragraphs 1 – 87 as if fully set forth herein.

116. The ECPA Wiretap statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any

communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

117. **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

118. Defendant's Website is an electronic communication service that gives users the ability to send or receive electronic communications to Defendant.

119. Defendant's Website is a conduit of communication between Plaintiff and Class Members and their respective medical provider (Defendant).

120. **Intentional Divulgence**. Defendant intentionally designed and/or implemented the Meta Pixel and was or should have been aware that it could divulge Plaintiff's and Class Members' Private Information.

121. **While in Transmission**. Upon information and belief, Defendant's divulgence of the contents of Plaintiff's and Class Members' communications was contemporaneous with their exchange with Defendant's Website, to which they directed their communications.

122. Defendant divulged the contents of Plaintiff's and Class Members' electronic communications without authorization. Defendant divulged the contents of Plaintiff's and Class Members' communications to Meta without Plaintiff's and Class Members' consent and/or authorization.

123. **Exceptions do not apply**. In addition to the exception for communications directly to an electronic communication service or an agent of an electronic communication service, the Wiretap Act states that "[a] person or entity providing electronic communication service to the

public may divulge the contents of any such communication":

- "as otherwise authorized in section 2511(2)(a) or 2517 of this title;"

- "with the lawful consent of the originator or any addressee or intended recipient of such communication;"

- "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or

- "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency."

U.S.C. § 2511(3)(b). None of the aforementioned exceptions apply in this case and do not shield Defendant from liability.

124.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; and reasonable attorneys' fees and other litigation costs reasonably incurred.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

a.  For an Order certifying the National Class and appointing Plaintiff and Counsel to represent each Class;

b.  For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

c.  For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members:

d.  For an award of damages, including, but not limited to, actual, consequential, statutory,

punitive, and nominal damages, as allowed by law in an amount to be determined;

e.  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f.  For prejudgment interest on all amounts awarded; and

g.  Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Date: October 6, 2025

Respectfully submitted:

*/s/ Robert R. Jimenez*
Mark E. Silvey (TN. Bar No. 013415)*
Robert R. Jimenez (Fla. Bar No. 72020)
Valentina R. Barboza (Fla Adm. Pending)*
**BRYSON HARRIS**
**SUCIU & DeMAY PLLC**
201 Sevilla Avenue, Suite 200
Miami, Florida 33134
P: (786) 206-7896
msilvey@brysonpllc.com;
rjimenez@brysonpllc.com;
vbarboza@brysonpllc.com

*Pro Hac Vice Motion forthcoming*

*Counsel for Plaintiff and the
Prospective Class*